UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| LISA VITTETOE, individually and as Next of Kin of Jason Adam Myers, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-CV-397-HBG |
| | ) | |
| BLOUNT COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 36].

Now before the Court is a Motion for Summary Judgment [Doc. 37], filed by Defendant Joseph Atkins, in his individual capacity, and Plaintiff's Supplemental Motion to Hold Defendant's Motion for Summary Judgment in Abeyance ("Supplemental Motion") [Doc. 67]. The Court has considered the parties' filings, and for the reasons more fully explained below, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment [**Doc. 37**] and **DENIES** Plaintiff's Supplemental Motion [**Doc. 67**].

## I. BACKGROUND

The Court will begin with the allegations in the Amended Complaint and then turn to the procedural history and the facts in this matter.

### A. Allegations in the Complaint

The Complaint [Doc. 1] in this matter was filed on September 1, 2017, and later amended [Doc. 26] on November 17, 2017. Specifically, the Amended Complaint seeks relief under the

Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988. In addition, the Amended Complaint states that this action arises under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101, and under common law for intentional and/or negligent infliction of emotional distress, loss of companionship, negligence, negligent supervision, deliberate indifference, and gross negligence.

Plaintiff is the mother of Jason Myers ("Myers"), who is now deceased. [Doc. 26 at ¶ 13]. The Amended Complaint alleges that on or about September 1, 2016, Myers and his father had an argument, and the police were called. [*Id.* at ¶ 19]. The Amended Complaint states that Myers walked to a friend's house and that he and his friend sat outside talking for about thirty minutes. [*Id.* at ¶ 21]. The Amended Complaint states that Myers talked normally, showed no signs of intoxication, and did not smell of alcohol. [*Id.* at ¶ 22]. Further, the Amended Complaint states that Myers acted normal, there were no visible marks on him, and he did not have a bloody nose. [*Id.* at ¶¶ 23-25].

The Amended Complaint avers that several police officers arrived to arrest Myers, who cooperated and complied with all requests of law enforcement during his arrest. [*Id.* at ¶ 27]. Myers was brought into the Blount County Jail on September 2, 2016, at approximately 1:20 a.m. [*Id.* at ¶ 28]. The Amended Complaint states that no mugshot was ever taken of Myers and that Myers was placed in a cell with at least five other inmates. [*Id.* at ¶¶ 29-30]. At approximately 3:00 a.m., an inmate in Myers's cell called for an officer to check on Myers, stating that Myers was barely breathing. [*Id.* at ¶ 31]. At approximately 4:00 a.m., an offer came out of Myers's cell, and Defendant Atkins was on his cell phone, stating, "You might want to come check him. Can't get him to roll over off his arm. Maybe that's why it's turning blue. He's blue around the mouth." [*Id.* at ¶ 32]. The Amended Complaint alleges that Defendant Atkins had no sense of urgency and

did not act as though the situation was an emergency. [*Id.* at ¶ 33]. The Amended Complaint avers that the inmates' calls for help continued and that around 5:00 a.m., another inmate was placed in the cell with Myers. [*Id.* at ¶ 35]. The Amended Complaint states that the inmate could tell that Myers had been beaten. [*Id.*].

The Amended Complaint states that there was blood on the wall beside Myers and that Myers was lying on the ground on his side facing out, gasping for breath, and clearly in distress. [*Id.* at ¶¶ 36-37]. A nurse attempted to take Myers's pulse seven times. [*Id.* at ¶ 38]. The Amended Complaint alleges that other prisoners continued to call the guards to help Myers and that around 6:00 a.m., Defendant Atkins came out of Myers's cell and said, "I need help, and I need help now." [*Id.* at ¶ 40]. The officers removed Myers from his cell, and one inmate said, "You need to do CPR." [*Id.* at ¶¶ 41-42]. Another inmate stated, "I think we just witnessed a murder because we called out for two hours." [*Id.* at ¶ 43]. Defendant Atkins told the inmate to "shut the **** up, or I'll beat you." [*Id.* at ¶ 44]. Finally, the Amended Complaint alleges that at about 6:16 a.m., Myers was given one round of chest compressions and that at approximately 6:45 a.m., Myers was taken by ambulance to the Blount Memorial Hospital where he was declared dead on arrival. [*Id.* at ¶¶ 45-46].

## B. Factual History

The following facts are taken from the parties' filings submitted in relation to Defendant Atkins's Motion for Summary Judgment, unless otherwise noted. On September 1, 2016, Myers and his father had an altercation, wherein Myers's father called the police. Deputy Joseph Maus responded to the complaint. [Doc. 49-4 at 1]. Myers's father stated that Myers was intoxicated and that Myers repeatedly struck him in the face with a closed fist and damaged his vehicle. [*Id.*]. Myers walked to a friend's house, and Deputy Maus made contact with Myers outside. [*Id.*].

According to Deputy Maus, Myers smelled of alcohol and was slurring his speech to the point that he was not understandable at times. [*Id.*]. Myers acknowledged that he struck his father, but he claimed that his father broke his (Myers's) nose. [*Id.*]. Deputy Maus reported that Myers showed no signs of physical injury, and he did not have any blood on his face or clothes, indicative of a nasal injury. [*Id.*]. Myers was arrested without incident and taken to the Blount County Jail. [*Id.*].

At about 12:15 a.m., on September 2, 2016, Myers was brought into the Blount County Jail, wherein two officers patted him down. [Ex. 4]. Myers was then seated on a bench in the intake area, while other officers began taking inventory of his property. [Ex. 4; Doc. 66-1 at 30]. Thereafter, Defendant Atkins placed Myers in a holding cell (B6) due to being intoxicated upon his arrival. [Doc. 37-5 at ¶ 9].

According to Defendant Atkins, he was unable to take Myers's photograph due to Myers being intoxicated upon arrival. [Doc. 36-5 at ¶ 10]. Defendant Atkins testified that the decision not to take Myers's mugshot was the consensus of the officers (i.e., Defendant Atkins, Deputy Boring, and Deputy Jordan) that were in the intake area. [Doc. 66-1 at 13]. Defendant Atkins explained that Myers was not booked, so there was no reason to take his fingerprints. [*Id.* at 14]. He testified that Myers was intoxicated when he came into the facility, "so we allowed him an opportunity to sober up a little bit by resting and allowing him to come back out at a later time to complete the process." [*Id.*]. Defendant Atkins explained that when the booking process is conducted, an individual's fingerprints and mugshot are taken, which occurs once the magistrate brings the paperwork the officers need for the inmate's bond information and court date. [*Id.* at 15].

In his Declaration, Defendant Atkins states that for about forty-five minutes to an hour, Myers was mumbling in his cell, walking back and forth, and occasionally looking out into the

intake area. [Doc. 37-5 at ¶ 11].[1] Defendant Atkins states that at approximately 1:45 to 2:00 a.m., someone made a comment about the way an individual was snoring and that when Defendant Atkins went to check, he found that Myers was snoring. [*Id.* at ¶ 13]. Defendant Atkins stated that Myers was breathing at that time but that he was snoring loudly, and he did not appear to be in any distress. [*Id.* at ¶ 14].

According to Defendant Atkins, at approximately 3:45 a.m., he and Magistrate Hinkle attempted to wake Myers so that Myers could be arraigned on his charges. [*Id.* at ¶ 15]. Myers was snoring loudly and did not respond to verbal commands. [*Id.* at ¶ 16]. In addition, Myers had nearly rolled off the bench, and Defendant Atkins rolled Myers to his side to keep him from falling off the bench. [*Id.*]. Later, at approximately 4:30 a.m., Ishmael Patterson was placed in the cell with Myers for about thirty to forty-five minutes. [*Id.* at ¶ 17]. There were no other inmates in the cell with Myers, except Patterson. [*Id.* at ¶ 18]. Defendant Atkins states that at approximately 4:50 a.m., he entered the cell with a pulse oximeter from the nurse and attempted to check Myers's heartbeat because he was still snoring loudly and was not responding to any verbal instructions. [*Id.* at ¶ 19]. Defendant Atkins states that he was unable to get a reading on the pulse oximeter due to Myers's hand and fingers being so cold. [*Id.* at ¶ 20]. Defendant Atkins submits that due to his prior experiences, if an individual's hands are too cool, the pulse oximeter will not provide a reading. [*Id.* at ¶ 21]. Defendant Akins states that he checked Myers's pulse on his carotoid and both wrists and that he had a strong and steady pulse of approximately 85. [*Id.* at ¶ 22].

Defendant Atkins states that breakfast trays arrived at approximately 5:00 a.m., and that he began to serve all the inmates. [*Id.* at ¶ 23]. He attempted to serve Myers at 5:10 a.m., but Myers

---

[1] During his deposition, Defendant Atkins stated that he needed to correct this statement in his Declaration. [Doc. 66-1 at 11]. Defendant Atkins testified that based on his review of the video from the jail facility, Ishmael Patterson was the individual pacing in the cell, not Myers. [*Id.*].

did not respond again.  [*Id.* at ¶¶ 24-25].  Defendant Atkins states that he finished feeding the other inmates and called the nurse to conduct a vitals check on Myers.  [*Id.* at ¶ 25].  Nurse Kathy Bishop arrived in the intake area, and she along with Defendant Atkins entered Myers's cell.  [*Id.* at ¶ 26].  Nurse Bishop was able to get a pulse of approximately 88, respirations of approximately 17-18, and she stated that his blood pressure was low, but she would keep a watch on him until she was relieved by the day shift staff.  [*Id.* at ¶ 27].

Defendant Atkins states that at approximately 5:45 a.m., he was asked to "medical" to assist in getting a vitals check on a high-risk inmate.  [*Id.* at ¶ 28].  He responded to medical and did not return to intake until about 5:55 a.m.  [*Id.*].  He states that at approximately 6:00 a.m., he was relieved by the day shift and that he gave Deputy Stooksbury his "full pass on."  [*Id.*].  Defendant Atkins states that after his shift, he learned that Myers had passed away.  [*Id.* at ¶ 31].  He states that he never used any force on Myers and that he is not aware of anyone using force or violence on Myers while he was incarcerated.  [*Id.* at ¶¶ 33-34].

Officer Patrice Jordan states that she was assigned to "Movement," which means that she assists with moving inmates from cell to cell and she assists with trays.  [Doc. 37-6 at ¶ 8].  She states that at approximately 3:45 a.m., Magistrate Hinkle arrived at intake to arraign Myers and that Officer Sarah Boring called into B6 and asked for Myers to step out over the speaker.  [*Id.* at ¶¶ 9-10].  Myers did not get up, so Defendant Atkins stepped into cell B6 to try to wake Myers.  [*Id.* at ¶ 11].  Defendant Atkins stated that Myers moved and grunted but would not get up, so Magistrate Hinkle said that he would try again later.  [*Id.* at ¶ 13].  Officer Jordan states that subsequently, at about 4:50 a.m., Nurse Bishop came into intake to hand out medication and that Defendant Atkins asked her to check Myers's pulse because Myers had been snoring since an hour after he came into jail.  [*Id.* at ¶ 14].  Defendant Atkins stepped into cell B6 with Nurse Bishop,

and she checked Myers's vitals. [*Id.* at ¶ 15]. Defendant Atkins stated that according to Nurse Bishop, Myers's vitals were normal. [*Id.*].

Officer Jordan states at 4:55 a.m., she received a call from another officer letting her know that the breakfast trays were ready, and she went to C-pod to "run the tower" while breakfast was served. [*Id.* at ¶ 16]. When she returned, she could still hear Myers snoring. [*Id.* at ¶ 17]. At approximately 6:01 a.m., Officer Stooksbury arrived to take over. [*Id.* at ¶ 18]. When Officer Jordan arrived home at approximately 6:41 a.m., she received a telephone call that Myers was deceased and that she needed to return to work. [*Id.* at ¶ 19]. Officer Jordan states that at no point did she witness anyone beat or use any kind of force or violence towards Myers. [*Id.* at ¶ 20].

Officer Sarah Boring also submitted a Declaration, stating that she worked intake on September 2, 2016. [Doc. 37-7 at ¶ 7].[2] According to Officer Boring, Myers came in on domestic assault and vandalism charges at approximately 12:36 a.m. [*Id.* at ¶ 8]. She states that Defendant Atkins placed Myers in cell B6 and that shortly thereafter, she could hear Myers snoring. [*Id.* at ¶¶ 9-10]. Officer Boring states that as she continued to book inmates, she could hear Myers snoring continuously. [*Id.* at ¶ 11]. She states that Magistrate Hinkle came into booking at 3:45 a.m., in order to tell Myers what he was charged with and to arraign him, but Myers was sleeping and snoring loudly. [*Id.* at ¶ 12]. Magistrate Hinkle said that he would come back later. [*Id.* at ¶ 13]. Officer Boring states that at approximately 5:30 a.m., Defendant Atkins, Nurse Bishop, and Corporal Keller went into cell B6 to check on Myers, where Myers continued to snore. [*Id.* at ¶ 14]. The nurse said Myers's vitals were fine. [*Id.*]. Subsequently, at about 6:00 a.m., she "gave pass" to Deputy Stooksbury and left the building. [*Id.* at ¶ 15]. She was later notified that Myers

---

[2] Plaintiff states that Officer Boring's Declaration is "notable" because it has the "infamous separate oath and signature page." [Doc. 49 at 5, n.11]. It is not clear if Plaintiff is attempting to argue that such is improper. In any event, the Court has considered Officer Boring's Declaration.

had passed away. [*Id.* at ¶ 16]. She did not witness anyone beating Myers or using any violence towards him whatsoever. [*Id.* at ¶ 17].

Officer Justin Keller also submitted a Declaration, stating that he was working as a corporal on September 2, 2016. [Doc. 37-9 at ¶ 7]. He states that he was conducting a walk through of intake at approximately 5:35 a.m., and that upon his arrival, Defendant Atkins told him that Myers was breathing but would not wake up. [*Id.* at ¶¶ 8-9]. Officer Keller asked Nurse Bishop to check on Myers, and she advised Officer Keller that just before his arrival, she had conducted some standard vital checks on him. [*Id.* at ¶ 10]. Nurse Bishop advised Officer Keller that Myers's blood pressure was a little low but that his pulse was normal. [*Id.* at ¶ 11]. Nurse Bishop, Defendant Atkins, and Officer Keller entered the cell, where Myers was found breathing deeply but not responsive. [*Id.* at ¶ 12]. Nurse Bishop checked Myers's pulse again and said it was normal. [*Id.* at ¶ 13]. All three of them exited the cell. [*Id.* at ¶ 14]. Officer Keller attended briefing, and shortly thereafter, he learned that Myers was found not breathing at the shift change and that Rural Metro had been called. [*Id.* at ¶ 15]. Officer Keller states that at no time did he observe anyone beat or use any force whatsoever on Myers. [*Id.* at ¶ 16].

Patterson also submitted a Declaration, stating that he was an inmate on September 2, 2016, and was placed in the cell with Myers at approximately 4:28 a.m. [Doc. 37-11 at ¶¶ 2-4]. Patterson states that Defendant Atkins checked on Myers at 4:50 a.m., and that Myers was lying on the bench. [*Id.* at ¶ 7]. Patterson states that during the time he was in the cell with Myers, no officer, nor any other person struck Myers, and that he did not see anyone harm Myers in any way. [*Id.* at ¶¶ 9-11]. Patterson states that he told the nurse that "she might want to do the little salt thing in the nose and check Mr. Myers because he might be overdosing." [*Id.* at ¶ 11]. He further states that he told the nurse that Myers was showing a lot of signs of overdosing. [*Id.* at ¶ 12]. He states

that Defendant Atkins and other officers checked on Myers and that they checked on Myers more than the nurse checked on him. [*Id.* at ¶¶ 13, 15]. He states that about 6:20 a.m., the nurse came in and brought her cart and that persons began emergency care on Myers. [*Id.* at ¶ 16].

According to Magistrate Hinkle, he attempted to make first contact with Myers on September 2, 2016, at about 3:47 a.m. [Doc. 42- at ¶ 7]. He states that Myers was sleeping and that Defendant Atkins attempted to wake Myers without success. [*Id.*]. Magistrate Hinkle states that Myers was "breathing (snoring) at this time." [*Id.*]. Magistrate Hinkle looked in on Myers at or around 4:22 a.m., and Myers was "breathing (snoring) at this time." [*Id.* at ¶ 8]. Magistrate Hinkle states that about 5:11 a.m., he attempted to complete the arraignment process once again with the same results. [*Id.* at ¶ 9]. Defendant Atkins contacted the nurse on duty and requested that she check Myers's vitals. [*Id.*]. Magistrate Hinkle states that Myers was "still sleeping and breathing (snoring)." [*Id.*]. Magistrate Hinkle states that at around 5:52 a.m., he attempted once again to complete the arraignment process prior to the scheduled shift change of the corrections officers, and the results were the same as the previous attempts in that Myers was "still sleeping and breathing (snoring)." [*Id.* at ¶ 10]. Magistrate Hinkle states that on September 2, 2016, he was in the intake area the majority of the time and that there were no signs of struggle of any type during his observation of Myers at any time. [*Id.*]. He states that no officer used any type of force against Myers. [*Id.* at ¶ 12].

The Regional Forensic Center's Autopsy Final Report ("Autopsy Report") states that at 6:25 a.m., Myers was discovered unresponsive, not breathing, and without a pulse. [Doc. 49-6 at 2]. The Autopsy Report states that Myers's condition prompted an immediate and aggressive resuscitation on the concrete floor of the jail cell, but no vital signs were obtained at any time during resuscitation, and Myers was pronounced deceased. [*Id.*]. The medical examiner noted

that Myers had cuts around his mouth and chin, contusions on his stomach and hands, abrasion on the chest, and an incised wound on his chest. [*Id.* at 4]. The Autopsy Report states that the main cause of death was buprenorphine and alcohol intoxication. [*Id.* at 2].

### C.    Procedural History

As mentioned above, the Complaint was filed on September 1, 2017, and later amended on November 17, 2017. Defendants filed their Answers [Docs. 32, 33], and shortly thereafter, Defendant Atkins moved [Doc. 37] for summary judgment and requested that the Court stay discovery in this matter. Plaintiff objected to Defendant Atkins's request to stay discovery, and the Court addressed the parties' positions at a motion hearing on May 11, 2018. At the hearing, Defendant Blount County represented to the Court that it had produced its entire file with respect to the investigation of the circumstances relating to Myers's death. Defendant Blount County and Plaintiff agreed to work together on Plaintiff's remaining discovery requests. The Court found that limited discovery was necessary in order to frame the qualified immunity issue, and the Court allowed the parties to proceed with a limited deposition of Defendant Atkins. In addition, the Court held that Plaintiff did not explain why she needed the other discovery that she requested but noted that she was free to question individuals who are not employed with Defendants.

On July 2, 2018, the parties proceeded with a video deposition of Defendant Atkins. Plaintiff filed a copy of Defendant Atkins's deposition transcript in its entirety. [Doc. 66-1]. The parties filed additional briefs relating to Defendant Atkins's Motion for Summary Judgment, and Plaintiff also filed her Supplemental Motion.

## II.     POSITIONS OF THE PARTIES

The Court will first summarize the parties' positions with respect to Defendant Atkins's Motion for Summary Judgment and then turn to the parties' positions with respect to Plaintiff's Supplemental Motion.

### A.     Motion for Summary Judgment

Defendant Atkins, in his individual capacity, moves for summary judgment as to all claims, arguing that the undisputed material facts in this case support judgment in his favor as a matter of law.  Specifically, Defendant Atkins states that he is entitled to summary judgment as to Plaintiff's 42 U.S.C. § 1983 claims under the qualified immunity doctrine because he has not violated any constitutional right and/or any clearly established constitutional right based on the particularized facts of this case.  In addition, Defendant Atkins states that he is entitled to summary judgment as to any state-law claim because he is entitled to qualified immunity and/or the undisputed material facts of this case do not support that Officer Atkins committed any state-law tort.  Further, Defendant Atkins argues that he is entitled to summary judgment as to any interference with the parent-child relationship because a loss of consortium claim is not cognizable under 42 U.S.C. § 1983 and the underlying claim should be dismissed.  Finally, Defendant Atkins states that he is entitled to summary judgment as to any claim for pre-death pain, suffering, fright, and punitive damages.   In support of Defendant Atkins's Motion for Summary, he filed the following exhibits:

1.      Criminal History Document of Myers [Doc. 37-1];

2.      Arrest Warrant of Myers from September 1, 2016 [Doc. 37-2];

3.      Intake/release Sheet of Myers from September 2, 2016 [Doc. 37-3];

4.      Jail Video from September 2, 2016 [Ex. 4];

5.      Declaration of Officer Joseph Atkins [Doc. 37-5];

6.      Declaration of Judicial Commissioner Eric Hinkle [Doc. 37-6];

7.      Declaration of Officer Patrice Jordan [Doc. 37-7];

8.      Declaration of Officer Sarah Boring [Doc. 37-8];

9.      Nurse Progress Notes [Doc. 37-9];

10.     Declaration of Officer Justin Keller [Doc. 37-10];

11.     Jail Incident Reports [Doc. 37-11]; and

12.     Declaration of Ishmael Patterson [Doc. 37-12].

Plaintiff responded [Doc. 49] in opposition to the Motion, arguing that there are too many disputed facts in this case, and therefore, summary judgment is inappropriate. Further, Plaintiff argues that Defendant Atkins is not entitled to qualified immunity as to any claim. Plaintiff has also raised evidentiary objections to Defendant Atkins's Exhibits 1-4, 9, and 11.

Defendant Atkins filed a Reply [Doc. 58], asserting that Plaintiff has not set forth any additional facts or evidence in support of her opposition to the Motion for Summary Judgment. With respect to Plaintiff's evidentiary objections, Defendant Atkins argues that the Court should consider all of the evidence because it can be presented in a form that is admissible at trial. Defendant Atkins maintains that he is entitled to qualified immunity because he did not violate any constitutional right. Further, Defendant Atkins argues that Plaintiff did not respond to his arguments with respect to dismissing the state law claims and the claim for punitive damages.

As mentioned above, the Court allowed the parties to proceed with Defendant Atkins's deposition and granted Plaintiff leave to file a supplemental brief in response to the Motion for Summary Judgment. Plaintiff filed a Supplemental Response [Doc. 66], arguing that Defendant Atkins's deposition illustrates why his Motion for Summary Judgment should be denied. In

addition, Plaintiff highlights Defendant Atkins's testimony that she believes is inconsistent with other evidence in this case.

Defendant Atkins filed a Reply [Doc. 69], maintaining that he is entitled to summary judgment as a matter of law. He argues that he is entitled to qualified immunity as to any 42 U.S.C. § 1983 claim for excessive force because the facts do not support that he took any action that violated the Fourteenth Amendment. Defendant Atkins states that he is also entitled to qualified immunity as to any claim for wrongful denial of medical care based on the undisputed facts of this case.

**B.      Plaintiff's Supplemental Motion to Hold Defendant's Motion for Summary Judgment in Abeyance**

Plaintiff states that she should be allowed full discovery before the Court determines the Motion for Summary Judgment. In the alternative, she asserts that she should be able to depose Nurse Bishop, other jail personnel, and particularly, Ishmael Paterson before responding to the Motion for Summary Judgment. For grounds, Plaintiff states that Defendant Atkins testified inconsistently with his own statements provided to the Tennessee Bureau of Investigation and statements and declarations of the other officers. Plaintiff requests full discovery, but at a minimum, requests the depositions of Patterson and Nurse Bishop. In addition, she states that she is entitled to the cell check records that are missing. In support of her Motion, Plaintiff filed the Declaration of Loring Justice [Doc. 67-1], Plaintiff's counsel. In the Declaration, Attorney Justice repeats what is stated in the Motion.

Defendant Atkins filed a Response [Doc. 70], arguing that the Motion should be denied because Plaintiff failed to satisfy the requirements under Federal Rule of Civil Procedure 56(d). Defendant Atkins states that even if Plaintiff complied with such requirements, she is still not entitled to the requested discovery. Defendant Atkins states that Plaintiff's request for "full

discovery" violates the dictates that discovery should be limited to the summary judgment determination. Further, Defendant Atkins states that the Court has already determined what discovery is appropriate with respect to the Motion for Summary Judgment. Defendant Atkins argues that it is unclear what discovery Plaintiff is requesting based on his alleged inconsistencies. Further, Defendant Atkins states that there are no material inconsistences in his statement. Defendant Atkins contends that with respect to each of Plaintiff's discovery requests, she does not explain how such discovery will change the legal and factual deficiencies in responding to his Motion for Summary Judgment.

## III.    STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be

material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## IV.    ANALYSIS

The Court has reviewed the filings in this matter, and for the reasons more fully explained below, the Court **GRANTS** Defendant's Motion [**Doc. 37**] and **DENIES** Plaintiff's Supplemental Motion [**Doc. 67**].

The Court will first address Plaintiff's Supplemental Motion [Doc. 67]. Next, the Court will rule on the evidentiary objections that were raised by both parties. Lastly, the Court will address the arguments raised in Defendant Atkins's Motion for Summary Judgment.

### A.    Plaintiff's Supplemental Motion

As mentioned above, Plaintiff's Supplemental Motion states that based on Defendant Atkins's deposition, full discovery should be permitted. In the alternative, Plaintiff requests that she be permitted to depose Nurse Bishop, Patterson, and other jail personnel. Plaintiff also argues that the records of the cell checks are missing and should be provided before the Court rules on

Defendant Atkins's Motion. In support of her Motion, Plaintiff argues that Defendant Atkins testified inconsistently with his own statements provided to the Tennessee Bureau of Investigation and with the other declarants' statements. Plaintiff further states that Defendant Atkins testified inconsistently with or failed to dispute Patterson's statements. Plaintiff filed a Declaration of Loring Justice [Doc. 67-1], which reiterates the position in the Motion.

Federal Rule of Civil Procedure 56(d) governs when a party concludes that additional discovery is necessary to respond to a motion for summary judgment. Rule 56(d) provides as follows:

> **(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> **(1)** defer considering the motion or deny it;
>
> **(2)** allow time to obtain affidavits or declarations or to take discovery; or
>
> **(3)** issue any other appropriate order.

Courts have explained that "Rule 56 also requires that 'a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information.'" *Williams v. Goodyear Tire & Rubber Co.*, No. 11-2035-STA, 2012 WL 1228860, at *2 (W.D. Tenn. Apr. 11, 2012) (quoting *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000)). "The Sixth Circuit has held that it is not an abuse of discretion for the district court to deny the Rule 56 request for discovery when the party "makes only general and conclusory statements [in its affidavit] regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or

falsity of the [claim] to be discovered." *Id.* (quoting *Ironside v. Simi Valley Hosp.,* 188 F.3d 350, 354 (6th Cir. 1999)) (brackets in *Williams*).

The Court finds that Plaintiff has not explained what material facts she hopes to uncover and why she has not previously discovered the information. Plaintiff states that she needs discovery because Defendant Atkins testified inconsistently in his deposition. Plaintiff does not explain such inconsistencies. The Court, however, has reviewed her filings submitted in response to Defendant's Motion for Summary Judgment, wherein she provides examples of such inconsistences. For instance, she asserts that in his Declaration, Defendant Atkins states that Myers paced for forty-five minutes to an hour and that this statement is inconsistent with the other declarants' statements that provide Myers immediately fell asleep. She later argues that Defendant Atkins's correction in his deposition (i.e., that Myers did not pace) is "exceptionally dubious standing alone." [Doc. 66 at 3]. The Court finds that whether Myers paced or immediately fell asleep after being placed in the cell is irrelevant to the issues in this case and does not create a genuine issue of material fact. Thus, further discovery on this issue is not warranted.

Further, in her responses to the Motion for Summary Judgment, Plaintiff raises issues as to why Defendant Atkins did not photograph Myers upon arrival, calling Defendant Atkins's testimony "exaggeration or fabrication." Plaintiff appears to question whether Myers was intoxicated when he arrived at the Blount County Jail, but as further explained below, Plaintiff cannot seriously dispute that Myers was intoxicated when he arrived. *See* [Doc. 49-4] (Narrative of Deputy Maus) ("Myers smelled of alcohol and was slurring his speech to a point he was not understandable at times.").

In summary, Plaintiff has not explained what material facts she hopes to uncover with full discovery or even with the alternative request for limited discovery. Accordingly, the Court finds Plaintiff's Supplemental Motion [**Doc. 67**] not well taken, and it is **DENIED**.

## B.     Evidentiary Objections

As mentioned above, Plaintiff objects to Exhibits 1-4, 9, and 11 that were filed in support of Defendant Atkins's Motion for Summary Judgment. In addition, Plaintiff objects to Defendant Atkins's testimony that he could not obtain a pulse oximetry reading because Myers's hand was too cool. Plaintiff argues that Defendant Atkins's statement is inadmissible because he lacks medical qualifications to testify as to the cause of why he could not obtain a pulse oximetry reading.

Defendant Atkins objects to Plaintiff's statements and exhibit [Doc. 49-1], relating to a former Blount County Sheriff's Deputy as irrelevant, immaterial, and inappropriate.

As an initial matter, the Court notes that both parties have submitted exhibits that are wholly irrelevant to the issues raised in this case. For instance, Defendant Atkins submitted Myers's criminal history as an exhibit [Doc. 37-1] to his Motion for Summary Judgment, calling Myers a "career criminal." Likewise, Plaintiff attached a news release [Doc. 49-1], regarding the conviction of a former Blount County Deputy for child pornography. Both parties object to each other's exhibits, stating that they are irrelevant. The Court finds that both parties' submissions are irrelevant, and the Court will disregard such filings.[3]

---

[3] Defendant Atkins requests that such allegations against Blount County should be stricken from the record. Generally, the Court only strikes pleadings and not information submitted in support of or in opposition to a motion for summary judgment. *Loadman Grp., L.L.C. v. Banco Popular N. Am.*, No. 4:10CV1759LIO, 2013 WL 1154528, at *1 (N.D. Ohio Mar. 19, 2013) (explaining that a motion to strike is not available for motions for summary judgment and the attachments thereto) (citing *Adams v. Valega's Prof. Home Cleaning, Inc.*, No. 1:12CV0644, 2012 WL 5386028, at *2 (N.D. Ohio Nov. 2, 2012)). As noted above, however, the Court will disregard the news release.

Plaintiff also objects to Defendant Atkins's testimony that he could not get a pulse reading on the oximeter because Myers's hand was too cool. Plaintiff argues that Defendant Atkins's testimony is an improper expert opinion. In analyzing the Motion for Summary Judgment, the Court has not taken Defendant Atkins's testimony as true (i.e., that the pulse oximeter will not work if the subject is too cool). Instead, the Court construes such testimony as Defendant Atkins's belief as to why he could not get a reading on the pulse oximeter.

Plaintiff also objects to Myers's arrest warrant [Doc. 37-2], the intake/release sheet [Doc. 37-3], the jail video [Ex. 4], the nurse's progress notes [Doc. 37-9], and the jail incident reports [Doc. 37-11]. Plaintiff argues these exhibits are "hearsay, contain copious hearsay-within-hearsay are unauthenticated and are otherwise objectionable." [Doc. 49 at 2]. In addition, Plaintiff states that all the Declarations contain attachments that constitute inadmissible hearsay.

Federal Rule of Civil Procedure 56(c)(2) states, "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The Advisory Committee Notes explain that the proponent of such evidence must establish that the evidence "is admissible as presented" or must "explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), Advisory Committee's Note to 2010 Amendment.

As an initial matter, the Court has not relied on Myers's arrest warrant, intake/release sheet, the jail incident reports, or the attachments to the Declarations in this opinion, and therefore, finds it unnecessary to determine whether such evidence is inadmissible given that the evidence does not affect the analysis. *See Conley v. Lakota Local Sch. Dist.*, No. 1:16-CV-1105, 2018 WL 4963485, at *9 (S.D. Ohio Oct. 15, 2018) (declining to strike certain evidence when the court did not review or rely upon it to decide the motion for summary judgment).

Plaintiff objects to Nurse Bishop's notes. [Doc. 37-9]. The Court observes that the only relevant portions of the nurse's notes are in relation to Myers's vitals. The Court agrees with Defendant Atkins that he could simply call a witness (i.e., the nurse) to authenticate such records. Further, the Court does not find such records constitute hearsay. *See* Fed. R. Evid. 803(4).

With respect to the video [Ex. 4] of the events, the Court will not exclude such evidence in considering Defendant Atkins's Motion. As Defendant Atkins states, the video could be authenticated by a witness that could lay the proper foundation. *See Laborde v. Casino*, No. 3:16-CV-769, 2018 WL 2943451, at *3 (M.D. Pa. June 12, 2018) (denying plaintiff's objection to the videotape, stating that "unauthenticated evidence may be considered on summary judgment so long as it can be authenticated at trial").

Further, with respect to the hearsay objection, the Court disagrees that the video constitutes inadmissible hearsay. The video is simply a recording of the events as they occurred. *See United States v. Munoz-Mosquera*, 101 F.3d 683 (2d Cir. 1996) ("The visual images on the videotapes at issue were not "oral or written assertion[s] or . . . nonverbal conduct of a person . . . intended by the person as an assertion") (citing Fed. R. Evid. 801(a)).[4] Before considering the video, however, the Court must explain how it intends to rely on the video. *See Colson v. City of Alcoa, Tennessee*, No. 3:16-CV-377, 2018 WL 1512946, at *5 (E.D. Tenn. Mar. 26, 2018) (explaining how the court "intends to view—not weigh, but view—[the video] through the prism of the legal standard governing summary judgment").

The Supreme Court "has held that a court may properly consider videotape evidence at the summary-judgment stage." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (citing *Scott v. Harris,* 550 U.S. 372, 380 (2007)). When the Court views the video, however, "the Court has to

---

[4] Although hearsay does not have to be an oral statement, *see* Fed. R. Evid. 801, the Court notes that the video does not contain any sound.

construe [the video] 'in the light most favorable to [the nonmoving party].'" *Colson*, 2018 WL 1512946, at *5 (citing *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)). The Court is also required, however, to "view the facts in the light depicted by the videotape." *Id.* (quoting *Scott*, 550 U.S. at 381). This simply means that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [video], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* (quoting *Scott*, 550 U.S. at 380).

Now that the Court has ruled on the evidentiary objections, the Court will turn to the Motion for Summary Judgment.

### C.    Defendant Atkins's Motion for Summary Judgment

As mentioned above, Defendant Atkins has moved for summary judgment, arguing that he is protected by qualified immunity. In addition, he argues that he is entitled to summary judgment as to any state-law claim because he is entitled to immunity and/or the undisputed material facts of this case do not support that he committed any state-law tort. Further, he states that Plaintiff's loss of consortium claim is not available and that he is entitled to summary judgment as to any claim for predeath pain, suffering, fright, and punitive damages.

The Court will first address Plaintiff's claims under 42 U.S.C. § 1983 and then address the remaining claims against Defendant Atkins.

### 1.    Section 1983

Pursuant to 42 U.S.C. § 1983, a person may claim damages against "[e]very person who, under color of [state law], subject, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A defendant can be liable

"only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act." *Doe v. Claiborne Cnty*, 103 F.3d 495, 512 (6th Cir. 1996) (citation omitted). Thus, a claim under § 1983 consists of two elements: (1) defendant must deprive plaintiff of either a constitutional right or a federal statutory right, and (2) defendant must deprive the plaintiff of one of these rights while acting under color of state law." *Id.*

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *Williams v. Godby*, 732 F. App'x 418, 420 (6th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If defendant shows that he/she was performing a discretionary function, then plaintiff has the burden of overcoming the qualified-immunity defense. *Gravely v. Madden*, 142 F.3d 345, 347 (6th Cir. 1998); *Williams*, 732 F. App'x at 420. Overcoming the qualified-immunity defense is a two-part inquiry. *Stephens v. City of Akron*, 729 F. Supp. 2d 945, 958 (N.D. Ohio 2010). A defendant is entitled to qualified immunity unless the evidence viewed in the light most favorable to plaintiff would permit a reasonable juror to find that (1) defendant's conduct violated a constitutional right, and (2) the right was clearly established. *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation and footnote omitted). The Court may approach the two-party inquiry in any order it deems appropriate. *Stephens*, 729 F. Supp. 2d at 958 (citing *Pearson v. Callahan,* 555 U.S. 223 (2009)).

Plaintiff alleges a claim for excessive force and deliberate indifference. The Court will address these claims separately.

### (i)  Excessive Force

Plaintiff brings her excessive force claim under the Fourteenth Amendment. *See* [Doc. 26 at ¶ 97] ("Using excessive force in making a detention or arrest or the gratuitous infliction of

violence violated [Myers's] rights secured to him by the Fourteenth Amendment."). Plaintiff further alleges in the Amended Complaint that "Defendants' unjustified beating of [Myers] deprived him of his rights under the Fourteenth Amendment." [*Id.* at ¶ 85]. The Court finds an analysis under the Fourteenth Amendment appropriate given that Myers was a pretrial detainee. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (explaining that when a citizen is neither free or a convicted person, "the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar governmental official's excessive use of force").

"When assessing excessive-force claims under the Fourth or Fourteenth Amendments, . . . we inquire whether the plaintiff has shown 'that the force purposely or knowingly used against him was objectively unreasonable.'" *Hopper v. Phil Plummer*, 887 F.3d 744, 752 (6th Cir. 2018) (quoting *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015)).

The Court notes that the instant case is much different than many of the excessive force claims litigated in courts, wherein courts are asked to determine whether the force used was excessive using the rubric discussed above. Here, the parties dispute whether Defendant Atkins used force at all. In Plaintiff's Amended Complaint, she alleges that Defendants unjustifiably beat Myers. In support of Defendant Atkins's Motion for Summary Judgment, he submitted a number of Declarations, which provide as follows:

- Defendant Atkins's Declaration [Doc. 37-5 at ¶ 33]: "I never used any force whatsoever on Myers."

- Officer Jordan's Declaration [Doc. 37-6 at ¶ 20]: "At no time did I observe anyone beat, or use any kind of force or violence towards Inmate Myers."

- Officer Boring's Declaration [Doc., 37-7 at ¶ 17]: "At no time did I observe anyone beating on Mr. Myers nor did I see any violence towards him whatsoever."

- Officer Keller's Declaration [Doc. 37-9 at ¶ 16]: "At no time did I observe anyone beat or use any force whatsoever on Inmate Myers."

- Ishmael Patterson's Declaration [Doc. 37-11 at ¶ 9-10]: "During the time that I was in the cell with Jason Myers, no officer nor any other person struck Jason Myers. I did not see anybody harm Jason Myers in any way whatsoever."

- Judicial Commissioner/Magistrate Eric Hinkle's Declaration [Doc. 42 at ¶¶ 11-12]: "My shift on the night/morning of September 2, 2016, was from 12:00 a.m. to 8:30 a.m. Although I have an office on the second floor, I am often at the master control room or the intake area of the jail. During my shift on the night of September 2, 2016, I was in the intake area the majority of the time. As confirmed by the video, there were no signs of struggle during my observation of Inmate Myers at any time. No officer used any type of force against Inmate Myers."

Defendant Atkins has also submitted the video of the Blount County Jail Facility taken on September 2, 2016. [Ex. 4]. The video shows Myers arriving in the pat down room at approximately 12:15 a.m. Myers is patted down and then exits the pat-down room and sits on a bench in the intake area. He sits on the bench for a few minutes, and then, at approximately 12:20 a.m., an officer escorts Myers to a cell. Myers enters the cell, but the officer does not. Myers can no longer been seen on the video.[5] The video shows officers occasionally peeking through the window into Myers's cell and occasionally entering the cell throughout the night.

The Court finds that there are no facts to which a reasonable jury could conclude that Defendant Atkins used any force against Myers. Plaintiff submits a number of unsupported allegations in an attempt to defeat summary judgment on this issue, but the Court finds such allegations unavailing. For instance, Plaintiff states that "an inmate could tell [Myers] has been beaten." [Doc. 49 at 2]; *see also* [Doc. 66 at 1] ("An inmate could tell Myers had been beaten.").

---

[5] The video footage submitted to the Court is of the intake area and the pat-down room and not of the cell. The Court is able to view the front of the cell but not inside the cell.

Plaintiff does not offer a citation to this claim, and the Court cannot find any evidence in the record of this claim. Only one inmate was placed in the cell with Myers and that inmate (Patterson) states, "During that time I was in the cell with Jason Myers, no officer nor any other person struck Jason Myers." [Doc. 37-11 at 3]. Further, Plaintiff states that blood was on the wall beside Myers. [Doc. 49 at 2, 25; Doc. 66 at 1]. Again, Plaintiff provides no evidence to support this allegation, but instead cites to her Amended Complaint and Defendant Atkins's deposition testimony. Defendant Atkins testifies, however, that he does not recall if there was blood on the wall. [Doc. 66-1 at 138]. This testimony does not equate to there being blood on the wall, nor does it equate to there being blood on the wall because Defendant Atkins beat or used excessive force against Myers.

Further, Plaintiff argues that there is a majority view and a minority view of the events that occurred on September 2, 2016. Plaintiff argues that the majority view is that Myers was cooperative on booking and that the minority view, which includes Defendant Atkins's view, is that Myers was too drunk to photograph. It is not clear to the Court why Plaintiff believes these "views" are inconsistent with one another. There is no dispute that Myers was cooperative that night, and there is no evidence that Myers refused to be photographed. Defendant Atkins testifies, "I mean, I don't see anything in my report to say that he was uncooperative. He was just intoxicated." [Doc. 66-1 at 23]. Defendant Atkins explains during his deposition that the consensus of the officers that were in the intake area was to not photograph Myers because he was intoxicated when he came into the facility. [*Id.* at 14]. Defendant Atkins states, "[Myers] was intoxicated when he came into the facility, so we allowed him an opportunity to sober up a little bit by resting and allowing him to come back out at a later time to complete the process." [Doc. 66-1 at 14].[6]

---

[6] As mentioned above, Myers's intoxication cannot seriously be disputed. *Plaintiff* has put forth evidence showing that Myers was intoxicated. The arresting officer noted in his narrative,

Plaintiff speculates that a reasonable jury could believe that Defendant Atkins's claim that he chose not to photograph Myers is a "ruse" to cover up Myers's injuries after Defendant Atkins hit Myers. The Court disagrees and finds no evidence in the record to support Plaintiff's theory. While Plaintiff insists that Defendant Atkins is "exaggerating or fabricating," Plaintiff offers nothing to support her claims.

In addition, Plaintiff argues that during Defendant Atkins's deposition, he testified that it was his practice to touch a detainee on the leg and shoulder to get he/she to respond, which correlates to Myers's wounds. Specifically, during his deposition, Defendant Atkins testifies, "I don't remember if I rubbed or if I just tapped him onto his shoulder, but I remember touching him to—on his shoulder and—or leg to wake him up." [Doc. 66-1 at 149]. Plaintiff argues that a reasonable jury could conclude that Defendant Atkins tapped Myers so hard that such wounds were caused. The Court disagrees and declines to find that Defendant Atkins's tapping of Myers in an attempt to wake him so that he could be arraigned constitutes excessive force as to violate Myers's constitutional rights.

Finally, Plaintiff compares the arresting officer's report to the Autopsy Report in support of her argument that Defendant Atkins hit Myers "gratuitously." Plaintiff also submitted post-mortem photographs of Myers, which the Court has placed under seal upon Plaintiff's request. Specifically, in the arresting officer's narrative, he states that he made contact with Myers outside of Myers's friend's house. [Doc. 49-4]. Myers acknowledged that he struck his father as a result of an argument but claimed that his father had broken his nose. [*Id.*]. The officer noted that Myers showed no signs of physical injury and did not have any blood on his face or clothes, indicative of

---

"Myers smelled of alcohol and was slurring his speech to a point he was not understandable at times." [Doc. 49-4 at 1]. The Autopsy Report concludes that Myers died of buprenorphine and alcohol intoxication. [Doc. 49-6 at 2].

a nasal injury.  [*Id.*].  On the Autopsy Report, the medical examiner documents a number of injuries on Myers's body.  [Doc. 49-6 at 4-5].

Plaintiff has not shown any evidence that Defendant Atkins caused these injuries to Myers, but instead, asks this Court to speculate that such injuries were caused by Defendant Atkins. While the Court notes that all reasonable inferences must be drawn in the nonmoving party's favor, *see Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 404 (6th Cir. 2015), the Court finds that this leap is not reasonable, especially in light of the video evidence.  The parties do not dispute that Myers arrived at the Blount County Jail at approximately 12:15 a.m.  *See* [Doc. 66 at 1] ("At 12:15 a.m., on September 2, 2016, [Myers] was brought into the Blount County Jail.").  The video shows him in the pat-down room at approximately 12:15 a.m., where officers pat him down without incident.  Myers then exits the pat-down room, sits on a bench, and then is escorted to his cell.  A few individuals enter the cell throughout the night, but nothing remarkable happens until about 6:20 a.m.  The Court finds that it is not reasonable to assume, in light of the video and the Declarations that were filed, that at some point, Defendant Atkins beat Myers.  Accordingly, the Court finds that there are no genuine issues of material fact on Plaintiff's excessive or unreasonable force claims, and such claims are hereby **DISMISSED**.

Further, the Court hereby **DISMISSES** Plaintiff's related claims regarding deprivation of life without due process, violation of substantive due process rights, and other civil rights, which are based on her excessive force allegations.  *See Graham v. Connor,* 490 U.S. 386, 395 (1989) ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of ... [the] 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."); *see also Estate of Bennett v. Wainwright*, 548 F.3d 155, 163 (1st Cir. 2008) ("The remaining substantive

due process claim premised on the deprivation of Bennett's life interest also fails because this is in essence an excessive force claim that should be—and is—brought under the Fourth Amendment.").

### (ii) Deliberate Indifference

Defendant Atkins asserts that he is entitled to qualified immunity because he called the nurse and relied on the nurse's medical judgment. He argues that he cannot be held liable for relying upon the medical care provided by the nurse. He states that he periodically checked on Myers and that he took Myers's vitals. He later called the nurse to check on Myers, and therefore, he was not deliberately indifferent to Myers's medical care.

Plaintiff submits a number of arguments in support of her claim that Defendant Atkins was deliberately indifferent to Myers's medical needs. Plaintiff asserts that Myers was placed in a holding cell and that Defendant Atkins did not attempt to determine whether Myers had overdosed, even in light of Defendant Atkins's claim that Myers was too drunk to photograph. Plaintiff states that there were a number of red flags regarding Myers's condition, including the fact that Myers never woke up throughout the night. Plaintiff maintains that despite Myers's failure to wake, Defendant Atkins did not check on him often enough or sufficiently monitor his physical condition. Plaintiff argues that Myers was in respiratory distress and asserts that the declarants' statements referencing snoring are "clearly used euphemistically for respiratory distress." [Doc. 49 at 5]. Plaintiff later argues, "If snoring cannot indicate distress or if Myers was not potentially in distress, [Defendant] Atkins would not have been asked to check on him." [Doc. 66 at 5].

Plaintiff also asserts that Defendant Atkins's testimony regarding the pulse oximeter is not credible, and the fact that Myers's body was too cool should have been another red flag. Plaintiff

states that Defendant Atkins should have sought help, emphasizing that Patterson, a lay person, could tell Myers was dying.

The Sixth Circuit had recently reiterated the deliberate indifference standard as follows: "The Eight Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where the claim is asserted on behalf of a pretrial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008)). "There are two parts to the claim, one objective, one subjective." *Id.*

"For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005)). "For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Spears*, 589 F.3d at 254 (quoting *Estate of Carter*, 408 F.3d at 311).[7] "A defendant has a sufficiently culpable state of mind if he 'knows of and disregards an excessive

_____

[7] Plaintiff claims that "**there is no subjective component**." [Doc. 66 at 10] (citing to *Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018) (Emphasis in [Doc. 66]). In *Richmond*, however, the Sixth Circuit did not hold that there was no subjective component claim. 885 F.3d 928, 938 (6th Cir. 2018). Instead, the Sixth Circuit stated, "This Court has not yet considered whether *Kingsley* similarly abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim." *Id.* at 938 n.3. The Sixth Circuit noted, "We find no circuit applying *Kingsley* specifically to a deliberate indifference to a detainee's serious medical needs claim." *Id.* *Richmond* was decided on March 22, 2018. In *Winkler*, which was decided on June 26, 2018, the Sixth Circuit used a two-part analysis to determine a deliberate indifference claim: objective and subjective. 893 F.3d at 890; *see also Williams v. City of Georgetown, Kentucky*, No. CV 5: 18-171-DCR, 2018 WL 5793854, at *5 (E.D. Ky. Nov. 5, 2018) (stating that *Richmond* does not apply *Kingsley* to deliberate indifference claims and holding that the court will continue to apply both the subjective and objective components). Thus, the undersigned will also apply the objective and subjective components.

risk to inmate health or safety.'" *Winkler,* 893 F.3d at 891 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "This means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

The Court will begin with the objective component—that is, whether Myers demonstrated a serious medical need. The Court finds this question to be a close call. The Court, however, is required to view the facts in the light most favorable to Plaintiff, and therefore, finds that Myers demonstrated a serious medical need. Here, Defendant filed Patterson's Declaration, which provides that when the nurse came in to check on Myers, he "told [her] that [Myers] was showing a lot of signs of overdosing." [Doc. 37-11 at ¶ 12]. As the Sixth Circuit recently stated, "In cases like this one, where death results from a failure to provide medical services, and there is evidence that lay persons . . . recognized the necessity for a doctor's attention, the objective prong is usually met." *Hinneburg v. Miron*, 676 F. App'x 483, 486–87 (6th Cir. 2017).

The Court will now turn to the subjective component. The Court finds that Defendant Atkins did not possess a sufficient culpable state of mind in denying medical care. Here, the video shows that Defendant Atkins checked on Myers a number of times throughout the night. Several officers and Magistrate Hinkle heard Myers snoring for several hours. At approximately 4:50 a.m., Defendant Atkins enters the cell with a pulse oximeter in order to take Myers's pulse. During his deposition, Defendant Atkins explained as follows on why he decided to use the pulse oximeter:

> It has been a solid time since he had been there asleep. I just wanted to check on him to make sure he's okay because normally after a certain amount of time, a three, four-hour time frame, people will start waking up, they will start asking why they are there, things like that. [Myers] hadn't done so. So I thought about giving him the pulse ox just to get a reading on him and make sure he will had a steady pulse and oxygen level.

[Doc. 66-1 at 79].  Defendant Atkins states that he was not able to get a pulse with the pulse oximeter, so he checked it manually, and Myers's pulse was 85.[8]  He reported his findings to the nurse.

Defendant Atkins told the nurse that he checked Myers's pulse manually because he "couldn't get anything with the pulse ox."  [*Id.* at 83, 88].  When asked if he entertained any other reason for not being able to obtain Myers's pulse with the oximeter, Defendant Atkins testified, "No, sir, I relayed the information to the nurse[,] and she seemed okay with what the numbers were.  So I left it at her discretion that time."  [*Id.* at 90].  Defendant Atkins stated that he was not concerned at that point because Myers had not shown any signs of visible distress for breathing. [*Id.* at 91].

Later, at approximately 5:00 a.m., Defendant Atkins tried to serve Myers a breakfast trey. He was snoring, but he was still not responsive.  He finished serving the inmates breakfast and called the nurse to request that she check Myers's vitals.  At approximately 5:12 a.m., the nurse and Defendant Atkins enters Myers's cell.  The video shows that Defendant Atkins and the nurse stay in the cell for about eight minutes.  Approximately five minutes later, Defendant Atkins reported to Officer Keller that Myers was breathing but would not wake up.  Officer Keller asked the nurse to check on Myers again.  The nurse told Officer Keller that just before his arrival, she had conducted standard vital checks on him.  The nurse told Officer Keller that Myers's blood pressure was a little low but that his pulse was normal.  At approximately 5:25 a.m., the nurse,

---

[8] As mentioned above, Plaintiff objects to Defendant Atkins's testimony that he checked Myers's pulse manually because Myers's hand was too cool.  The Court has not taken Defendant Atkins's testimony as true (i.e., that the pulse oximeter failed to provide a reading because Myers's hand was cool) but simply an explanation as to why he believed a manual test was appropriate. Plaintiff later argues, however, that Myers's cool hand should have been a red flag, but as noted above, the nurse checked on Myers, with Defendant Atkins present, two times after Defendant Atkins manually took Myers's pulse

Officer Keller, and Defendant Atkins all enter Myers's cell.[9] The nurse checked Myers's vitals and reported that his vitals were normal. Her notes confirm that Myers's vitals were normal at approximately 5:30 a.m. Officer Keller went to briefing, and Defendant Atkins was called to assist in getting a vitals check on a high-risk inmate.

Defendant Atkins returned at approximately 5:55 a.m. At approximately 6:00 a.m., he provided Deputy Stooksbury his "full pass on." [Doc. 37-5 at ¶ 28]. He testified that he let Deputy Stooksbury know what the nurse found and that Myers was intoxicated and waiting to be arraigned. Specifically, Defendant Atkins reported, or "passed along," that the nurse checked on Myers and that based on what the nurse said, there was no need to be concerned other than Myers was intoxicated and waiting to be arraigned by the magistrate because he was still sleeping. [Doc. 66-1 at 112, 113].

At approximately 6:18 a.m., an officer enters Myers's cell. It appears from the officer's conduct that she discovers something is wrong with Myers. The nurse enters Myers's cell at approximately 6:22 a.m. Subsequently, emergency personnel arrive and take Myers out in a stretcher.

The Court has considered the circumstances of this case, along with Defendant Atkins's conduct, and finds such circumstances fall in line with other cases wherein officers have relied on medical staff. *See McGaw v. Sevier County*, 715 F. App'x 495, 498–99 (6th Cir. 2017) ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice."); *see also Spears*, 589 F.3d at 255 (concluding that nonmedical jail personnel are entitled to

---

[9] The Court observes that the video also shows Magistrate Hinkle entering the cell at this time.

reasonably rely on the assessments made by the medical staff); *Davis v. Roane Cnty, Tenn.*, No. 3:12-CV-634, 2016 WL 125497, at *7 (E.D. Tenn. Jan. 11, 2016) (finding that the officer was not deliberately indifferent when he took the inmate's vital signs and reported such findings to the nurse and followed the nurse's instructions).

Plaintiff argues that there were a number of red flags, such as Myers would not wake up and that his snoring was clearly a sign of respiratory distress. Here, Defendant Atkins manually checked Myers's pulse at 5:40 a.m., and found his pulse to be normal. He reported this finding to the nurse, including the fact that he was unable to get a reading from the pulse oximeter. Later, when Myers would not wake up for breakfast, Defendant Atkins called the nurse. *Compare Winkler*, 893 F.3d at 898 (finding no deliberate indifference on the part of the officer, who failed to take any steps after the inmate would not get up to receive his meal, because there was no evidence that the officer perceived a substantial risk of harm to the inmate's health). The nurse checked on Myers, with Defendant Atkins present, two additional times after Defendant Atkins checked him. The last time the nurse checked Myers, his vitals were normal. Defendant Atkins reported this finding to Deputy Stooksbury and then left when his shift ended at approximately 6:00 a.m. Unfortunately, an officer found Myers not breathing approximately eighteen minutes later.

Given these circumstances, the Court does not find that Defendant Atkins had a sufficiently capable state of mind in delaying medical care. *Hinneburg,* 676 F. App'x at 488 (explaining that the most the officers knew was that the inmate was intoxicated, but no evidence suggested that they knew or could infer that the inmate had a serious medical need). Accordingly, the Court hereby **DISMISSES** all Plaintiff's claims against Defendant Atkins as they relate to Plaintiff's allegation of deliberate indifference to Myers's serious medical needs. *See Burgess*, 735 F.3d at

473 (explaining that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process") (quoting *United States v. Lanier*, 520 U.S. 259, 272 n. 7, (1997)) (other citations omitted).

## 2. Negligence Claim

Defendant Atkins states that he is entitled to summary judgment as to any state-law negligence claim because he is entitled to immunity and/or he was not negligent. Defendant Atkins states that under the Tennessee Governmental Tort Liability Act ("TGTLA"), when immunity is removed as to the governmental entity, the individual may not be held liable. In addition, Defendant Atkins argues that he was not negligent. Plaintiff does not respond to Defendant Atkins's argument.

Defendant Atkins relies on Tennessee Code Annotated §§ 29-20-205 and 310(b). Specifically, Tennessee Code Annotated § 29-20-205 provides, "Immunity from suit against all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." The statute, however, provides a number of exceptions. Section 310(b) provides, "No claim be brought against an employee or judgment entered against an employee for damages for which the immunity of the governmental entity is removed by this claim . . ." Tenn. Code Ann. § 29-20-310(b); *see Colson*, 2018 WL 1512946, at *14 ("In other words, the TGTLA does not provide governmental entities and employees with simultaneous immunity.").

Defendant Atkins has not sufficiently argued whether the exceptions in § 205 are applicable, and without briefing, the Court declines to make any findings as to whether immunity has been removed as to Blount County. Defendant Atkins also argues, however, that he did not

take any action as to proximately cause Myers's injuries. The Court agrees and finds that Defendant Atkins is entitled to summary judgment on Plaintiff's negligence claim because his conduct did not proximately cause Myers's injuries.

"In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: '(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty, (3) an injury or loss; (4) cause in fact, and (5) proximate or legal cause.'" *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn. 1995)).

Proximate causation is typically a question for the jury, "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005) (quoting *Haynes v. Hamilton Cnty,* 883 S.W.2d 606, 612 (Tenn.1994)). "Proximate cause puts a limit on the causal chain, such that, even though the plaintiff's injury would not have happened but for the defendants' breach, defendants will not be held liable for injuries that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." *Id.* at 719 (citing *Haynes*, 883 S.W.2d at 612). "Thus, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established." *Id.* (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)).[10]

As explained above, the Court does not find that Defendant Atkins used force against Myers, let alone excessive force. Further, the Court finds that Defendant Atkins reasonably relied

---

[10] Defendant Atkins has not argued that his actions were not the cause in fact of Myers's injuries, which is a distinct element from proximate causation. *Hale*, 166 S.W.3d at 718. Thus, the Court will not analyze whether Defendant Atkins's actions were the cause in fact of Myers's injuries.

on the nurse's vital checks on Myers, and therefore, Defendant Atkins's actions did not proximately cause Myers's injuries. Accordingly, the Court **DISMISSES** Plaintiff's claim of negligence against Defendant Atkins.

### 3. Battery Claim

Defendant Atkins argues that he cannot be held liable for battery because he is entitled to qualified immunity. Plaintiff has not responded to Defendant Atkins's argument.

"Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." *Griffin*, 604 F.3d at 956. The Sixth Circuit has further explained, "[W]hether the analysis concerns whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns whether an officer committed state-law battery by using force that was 'clearly excessive,' the same principles . . . are applied." *Id.* (quoting *Lee v. Metro. Gov't of Nashville & Davidson Cnty*, 596 F.Supp.2d 1101, 1118 (M.D. Tenn. 2009)).

In the instant matter, the Court does not find that Defendant Atkins used force against Myers. Accordingly, the Court hereby **DISMISSES** Plaintiff's battery claim for the reasons described above. *Griffin*, 604 F.3d at 957 ("We thus find no error in the district court's conclusion that because Hardrick was entitled to summary judgment on Griffin's § 1983 claim, he was also entitled to summary judgment on her state-law battery claim.").

### 4. Intentional Infliction of Emotional Distress Claim

Defendant Atkins asserts that he did not commit any intentional or reckless act that was sufficiently outrageous to satisfy a claim for intentional infliction of emotional distress. He argues that he did not use any force. Further, he states that he took Myers's vitals and later called the nurse. Defendant Atkins argues that he relied upon the nurse's judgment and that such actions do

not constitute outrageous behavior. In addition, he argues that Plaintiff cannot show that Myers suffered a serious mental injury. Plaintiff did not respond to this argument.

Pursuant to Tennessee law, the elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff. *Rogers v. Louisville Land Co.,* 367 S.W.3d 196, 205 (Tenn. 2012). Intentional infliction of emotional distress claims may be decided entirely on summary judgment as a matter of law. *McGrew v. Duncan*, 333 F. Supp. 3d 730, 742–43 (E.D. Mich. 2018), *appeal filed*, No 18-2022 (6th Cir. Sept. 7, 2018) (citing *Miller v. Currie*, 50 F.3d 373, 377–78 (6th Cir. 1995)).

The Court does not find that Defendant Atkins committed an intentional or reckless act that was sufficiently outrageous to constitute intentional infliction of emotional distress. As mentioned above, the Court does not find that Defendant Atkins used force against Myers. Further, Defendant Atkins checked Myers's vitals. He reported his findings to the nurse. Approximately, twenty minutes later, Defendant Atkins asked the nurse to check on Myers's vitals. The nurse relays to Defendant Atkins that Myers's vitals were normal but that his blood pressure was low. Ten minutes later, the nurse, Defendant Atkins, and Officer Keller enter Myers's cell, where the nurse checks Myers again. According to the nurse, Myers's vitals were normal. Thirty minutes later, Defendant Atkins reports to Officer Stooksbury that Myers was intoxicated, his vitals were normal, and he had been sleeping and was waiting to be arraigned. Based on these circumstances, the Court does not find that Defendant Atkins's conduct was intentional or reckless or that such conduct is so outrageous that it is not tolerated by civilized society. Accordingly, the Court **DISMISSES** Plaintiff's claim of intentional infliction of emotional distress against Defendant Atkins.

### 5.     Loss of Consortium, Pre-death, Pain, Suffering, and Fright Claims

Defendant Atkins argues that a claim for loss of consortium is not recognizable under federal or state law and should be dismissed.  Defendant Atkins asserts that Plaintiff's claim for Myers's pre-death pain, suffering, and fright is not a cognizable claim but merely an element to damages.  Plaintiff has not responded to Defendant Atkins's argument.

Defendant Atkins treats Plaintiff's interference with parent-child relationship claim as a loss of consortium claim.  The Court agrees that Plaintiff cannot maintain a loss of consortium claim under § 1983.  *Boyer v. Lacy,* 665 F. App'x 476, 485 (6th Cir. 2016) (explaining that the Court has foreclosed an independent federal claim for loss of consortium under § 1983) (citing *Claybrook v. Birchwell*, 199 F.3d 500 (6th Cir. 2000)).  This does not, however, prevent a claim under state late.  *Id.* at 485 (noting that "precedent shows that a state-law claim for loss of consortium may be brought alongside a substantive § 1983 claim, pursuant to the pendent jurisdiction provided by 28 U.S.C. § 1367").

Tennessee recognizes that filial consortium damages may be recovered in a wrongful death action.  *Hancock v. Chattanooga-Hamilton Cnty Hosp. Auth.,* 54 S.W.3d 234, 236 (Tenn. 2001) ("[W]e hold that filial consortium damages may be recovered in a wrongful death action.").  The Court observes, however, that a claim for loss of consortium or filial consortium is not a separate cause of action but simply a component of a wrongful death action.  *Marine v. City of Chattanooga, Tenn.*, No. 1:09-CV-219, 2009 WL 4348587, at *4 (E.D. Tenn. Nov. 24, 2009).  The Tennessee wrongful death statute provides as follows:

> Where a person's death is caused by the wrongful act, fault or omission of another and suit is brought for damages, as provided for by §§ 20-5-106 and 20-5-107, the party suing shall, if entitled to damages, have the right to recover for the mental and physical suffering, loss of time and necessary expenses resulting to the deceased from the personal injuries, and also the damages resulting

> to the parties for whose use and benefit the right of action survives
> from the death consequent upon the injuries received.

Tenn. Code Ann. § 20-5-113.

In the present matter, Plaintiff alleges in the Amended Complaint that "Defendants killed Jason without any cause to do so." Defendant Atkins has shown that he did not use force against Myers and that after he checked Myers's vitals, the nurse checked Myers's vitals two more times. Accordingly, the Court finds that Defendant Atkins is entitled to summary judgment on Plaintiff's wrongful death claim against him. Further, the Court agrees with Defendant Atkins that Plaintiff's claims of pre-death suffering, pain, and fright are simply elements of damages.

**6.      Punitive Damages**

Defendant Atkins argues that he is entitled to summary judgment as to any punitive damages claim pursuant to 42 U.S.C. § 1983 because he did not act in a "callous disregard" to any constitutional right of Myers. Further, he asserts that punitive damages are not applicable because he did not act intentionally, fraudulently, maliciously, or recklessly in relation to Myers.

For the reasons described above, the Court agrees with Defendant Atkins that punitive damages are inappropriate. Accordingly, the Court **DISMISSES** Plaintiff's punitive damages claim against Defendant Atkins.

**V.      CONCLUSION**

Accordingly, for the reasons explained above, Defendant Atkins's Motion for Summary Judgment [**Doc. 37**] is **GRANTED**, and Plaintiff's Motion to Hold Defendant's Motion for Summary Judgment in Abeyance [**Doc. 67**] is **DENIED**. Given that the Court has now ruled on the Motion for Summary Judgment, the stay of discovery in this matter is **LIFTED**.

ORDER ACCORDINGLY.

Bruce Guyton

United States Magistrate Judge